UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JASMINE C. JOHNSON,      §
     §
    *Plaintiff*,      §
     §
     §
*v.*      §      Civil No. SA-17-cv-00442-OLG
     §
     §
HYATT CORPORATION, d/b/a HYATT      §
REGENCY SAN ANTONIO      §
RIVERWALK,      §
     §
    *Defendant.*      §

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered Defendant Hyatt Corporation's Motion for Summary Judgment (docket no. 22) (the "Motion").[1] Having considered the Motion, the parties' briefing and the record of summary judgment evidence, the Court finds that Defendant's Motion should be **GRANTED**.

## BACKGROUND

Plaintiff Jasmine Johnson ("Plaintiff" or "Johnson") began working as a waitress in Defendant Hyatt Corporation's ("Defendant" or "Hyatt") San Antonio, Texas hotel in December 2014. *See* docket no. 1 ¶ 5. Specifically, Plaintiff was hired as a cocktail waitress at Q Bar in the Hyatt Regency San Antonio Riverwalk Hotel (the "Hotel"). *See id.* As of the date of the Motion, Plaintiff remains employed as a waitress at Q Bar. *See* docket no. 22-1 p. 43.

At the time of Plaintiff's hiring by Hyatt, Plaintiff received an employment handbook. *See* docket no. 22-1 pp. 88-90. Included in the employment handbook was a copy of Hyatt's anti-harassment reporting policy. *See id.*; docket no. 22-2. The policy in effect at the time of the

---

[1] The Court has also considered—and addresses in this Order—Plaintiff's Motion to File Under Seal (docket no. 27) and Motion for Leave to File Sur-Response (docket no. 29).

events underlying the lawsuit contained the following information with respect to reporting incidents of harassment:

> If you feel that you are being harassed, you should tell that individual to stop the harassing conduct. Additionally, you should report the matter to Human Resources, your General Manager, or the Ethics Point Hotline at (866) 294-3528 or www.hyattethics.com immediately . . . . Any employee who is aware that another employee is being harassed should report the harassment to Human Resources, your General Manager, or the Ethics Point Hotline at (866) 294-3528 or www.hyattethics.com immediately.

*See* docket no. 22-3.

Plaintiff's claims center around allegations involving sexual harassment, assault or other inappropriate conduct by three individuals during Plaintiff's employment at Q Bar: (1) hotel guest Chapman, (2) hotel guest Paganelli, and (3) co-worker Guerrero. The Court will provide brief factual background about each alleged incident or series of incidents.

Plaintiff alleges that shortly after her employment began, hotel guest Chapman began directing harassing behavior towards Plaintiff, including both unwanted sexual advances and sexually explicit comments.[2] *See* docket no. 24 ¶ 5; docket no. 22-1 pp. 121-25. Plaintiff alleges that these incidents occurred "every few months" or sometimes "more frequent[ly]" from late 2014 until November 2016. *See* docket no. 22-1 p. 125. Plaintiff testified that she initially reported the comments to her immediate supervisors, including Hotel employees Hall, Lozano and Jackson. *See* docket no. 24-1 pp. 109-10, 138. In November 2015, Hall apparently exchanged emails with Chapman in which Chapman apologized for "causing any issues" (although the emails do not make clear what information Hall had received or the "issues" being

---

[2] Plaintiff testified that Chapman used abusive language, including stating that "he wanted to go down on (Plaintiff)" and "that he wanted to rim (Plaintiff)" and asking Plaintiff if she "would like it if someone ate (her) pussy." *See* docket no. 24-1 pp. 119-21. Plaintiff's testimony also indicates that Chapman would comment on her breasts. *See id.* Finally, Johnson testified that Chapman repeatedly asked her out multiple times, and after she turned down his requests, he berated her on occasion. *See id.* at pp. 119-122, 141.

referenced), and Hall encouraged Chapman to return to the restaurant. *See* docket no. 24-2. Plaintiff asserts that neither Hall nor the other supervisors took action to report the harassment as required by Hyatt's employee policies, and that Chapman continued his pattern of harassment. *See* docket no. 24 ¶ 12. The record indicates that Defendant's human resources team did not become aware of Chapman's alleged harassment until Plaintiff told them about it in November 2016, when an investigation into a separate harassment incident (described below) was being conducted. *See* docket no. 24-6 pp. 23-25. By December 1, 2016, Chapman had been asked to—and had agreed to—no longer return to Q Bar or the Hotel. *See* docket no. 22-10 ¶¶ 7-8

Plaintiff's claims also center around conduct directed towards her by hotel guest Paganelli. Around midnight on the evening of November 9, 2016, the record indicates that Plaintiff was serving Paganelli at a table in Q Bar. *See* docket no. 22-1 p. 199. While he was at Q Bar, Paganelli grabbed Plaintiff by the arm and waist and pulled her towards him.[3] *See id* at p. 172; docket no. 22-6; docket no. 22-7; docket no. 24-9. He then kissed her and bit her neck. *See* docket no. 22-1 p. 172.

Plaintiff immediately left the area around Paganelli's table but did not immediately tell anyone about the incident. *See* docket no. 22-1 pp. 177-78. Meanwhile, another hotel guest who had seen the encounter reported it to an employee at the bar, De La Vega, as well as to the Hotel's front desk. *See id.* at p. 176-77; docket no. 22-8. The front desk staff called security, and the officer on duty, Pineda, arrived at Q Bar approximately 10 minutes after the incident began. *See* docket no. 22-6; docket no. 22-9 (camera footage depicting Paganelli grabbing Plaintiff's arm at 39:13 on the video and security arriving to speak with Paganelli at 49:15). Plaintiff had no other interactions with Paganelli between the incident and Pineda's arrival at Q Bar. *See* docket

---

[3] The Court has been provided with video footage of the incident. *See* docket no. 24-9.

no. 22-1 p. 199. Pineda spoke with Plaintiff and asked her whether she wanted to press charges, however, Plaintiff said that she simply wanted Paganelli removed from the bar. *See* docket no. 22-6. Pineda then directed Paganelli to leave Q Bar and return to his room, and the record indicates that Paganelli did so. *See id.*

Following the incident, Plaintiff called the police, and the responding officer viewed the security footage and arrested Paganelli for assault in the early hours of November 10, 2016. *See* docket no. 22-7. Although Paganelli was not scheduled to check out until two days later, the record indicates that he was evicted from the Hotel when he returned to his room following his arrest and booking. *See* docket no. 22-10 ¶¶ 3-4; docket no. 22-11. The record also indicates that Paganelli has been barred from the Hotel, and it appears that he has not attempted to return to the premises. *See* docket no. 22-10 ¶¶ 4-5.

The morning after the incident involving Paganelli, Plaintiff spoke with members of Hyatt's human resources team, Bowden and Ruiz, who had called Plaintiff as part of their investigation into the incident the night before. *See* docket no. 22-1 p. 150; docket no. 22-5 pp. 21-22. During that discussion, Plaintiff also mentioned the prior incidents involving Chapman, and it was in response to these communications that the Hotel's General Manager Melhado, contacted Chapman. *See* docket no. 22-1 pp. 150-53; docket no. 22-5 pp. 23-26; docket no. 22-10 ¶ 7. Although Chapman denied the allegations, Melhado asked that Chapman not return to Q Bar. *See* docket no. 22-10 ¶ 7. Chapman agreed not to return to the Hotel, and it appears that Chapman has not returned to the Hotel since that date. *See id.* at ¶ 8.

Approximately two months later, on January 13, 2017, one of the line cooks in the Q Bar kitchen, Guerrero, approached Plaintiff and told her that she "look[ed] like a fucking hooker." Docket no. 22-1 p. 200. Plaintiff informed her union representative, who advised her to report

Guerrero to his manager, Head Chef Young. *See id.* at pp. 200-01. Plaintiff reported the incident to Young, and according to Plaintiff, Young asked her a series of insensitive questions including what she had done to provoke Guerrero's statement. *See id.* at p. 201. Following his conversation with Plaintiff, Young spoke with Guerrero, and Guerrero apparently admitted to making an insensitive comment. *See id.*; docket no. 22-14. Guerrero offered to apologize to Plaintiff, but Plaintiff was uncomfortable speaking with him at that time. *See* docket no. 22-1 p. 203. Young then called Ruiz (in the human resources department) to tell her about the incident, and Ruiz and Young made plans to speak with Guerrero. *See* docket no. 22-5 pp. 38-40. Young and Ruiz ultimately met with Guerrero, spoke with him about the inappropriate nature of his conduct, and issued him a written reprimand on January 25, 2017. *See* docket no. 22-5 pp. 40-42; docket no. 22-13 pp. 13-14; docket no. 22-15. The reprimand warned that further violations could result in termination of employment. *See* docket no. 22-15.

Shortly after the incident, Plaintiff's union filed a grievance on Plaintiff's behalf, complaining about Guerrero's statement and Young's response. *See* docket no. 22-16. Ruiz and Young met with Plaintiff and her union representatives and responded to the grievance by (i) confirming that Guerrero was issued a formal reprimand, (ii) having Young apologize for Plaintiff "feeling like he had not handled [the] incident as it should have been handled," (iii) re-training every "venues" manager on the protocols regarding workplace harassment, and (iv) re-training every Hotel employee on Hyatt's anti-harassment policy. *See id.*; docket no. 22-17.

On February 10, 2017, about a month after the incident with Guerrero, Johnson filed a charge of discrimination with the EEOC. *See* docket no. 22-18. The charge of discrimination detailed the incidents that had occurred with Chapman, Paganelli and Guerrero. *See id.* Plaintiff's EEOC complaint alleged harassment, discrimination and retaliation due to her gender. *See id.*

Shortly after filing her EEOC complaint, Johnson met with an EEOC investigator, who observed in her report that Hyatt "had taken care of her complaints" and that, "by her own words[,] the harassment with all three individuals stopped." *Id.* Following the interview, the EEOC dismissed Plaintiff's charges. *See id.*

On May 17, 2017, Plaintiff filed the present lawsuit against Defendant. *See* docket no. 1. Plaintiff's Complaint asserts Title VII claims against Defendant under both a "hostile work environment" and "retaliation" theory. *See id.* at pp. 6-7. With respect to Plaintiff's hostile work environment claims, Plaintiff alleges that Hyatt failed to adequately respond to the incidents of harassment or assault perpetrated by Chapman, Paganelli and Guerrero.[4] *See id.* Plaintiff's retaliation claim asserts that—following the reports of harassment by Plaintiff—(i) Defendant modified Plaintiff's schedule to give her unfavorable shifts, (ii) Young subjected Plaintiff to "unjust scrutiny," and (ii) Guerrero intentionally misprepared her food orders so that Plaintiff would receive reduced tip income. *See* docket no. 1; docket no. 22-1 pp. 117-18.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). In making the determination of whether a genuine issue of material fact exists, the court reviews the facts and

---

[4] Plaintiff's complaint contains separate counts for "Sexual Harassment" and "Sex Discrimination," however, each count contains nearly identical allegations and appears to assert a "hostile work environment" claim against Defendant. *See* docket no. 1 ¶¶ 21, 26. At her deposition, Plaintiff confirmed that both "counts" concerned Hyatt's allegedly inadequate response to harassment by Chapman, Paganelli and Guerrero. *See* docket no. 22-1 p. 119. Accordingly, the Court will analyze counts I and II together when the Court considers Plaintiff's "hostile work environment" theory of relief.

inferences to be drawn from them in the light most favorable to the non-moving party. *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.,* 336 F.3d 410, 412 (5th Cir. 2003).

At the summary judgment stage, the movant bears the burden of identifying those portions of the record it believes demonstrate the "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir. 2005). However, the movant need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden "by pointing out 'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.,* 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)). If the movant satisfies its burden, the non-moving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted); *see also Lincoln Gen. Ins. Co.,* 401 F.3d at 349. At the summary judgment stage, the non-movant cannot meet its burden with "conclusory allegations" or "unsubstantiated assertions." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 399 (5th Cir. 2008). In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Tamez v. Manthey,* 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "As to materiality, the substantive law will identify which facts are material." *Anderson,* 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## DISCUSSION

Plaintiff asserts both a "hostile work environment" and a "retaliation" claim against Defendant, and Defendant moves for summary judgment as to each of Plaintiff's theories of relief.

### I.   Hostile Work Environment

An employer may be held liable for sexual harassment under Title VII if the employer fails to adequately respond to incidents of sexual harassment that have created a hostile work environment. To succeed on the merits on such a theory, a plaintiff must show that: (1) plaintiff belonged to a protected class, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on his or her sex, (4) the harassment was sufficiently severe or pervasive to alter the conditions of his or her employment and to create an abusive working environment, and (5) the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)); *see also Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479 (5th Cir. 2008). Defendant's Motion asserts that Plaintiff has failed to satisfy the fourth and/or fifth elements of her hostile work environment claims.[5]

"Title VII does not reach conduct that is merely offensive—it proscribes only an environment that a reasonable person would find hostile or abusive." *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 839 (5th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

---

[5] Defendant's Motion does not assert that Plaintiff has failed to satisfy the first three elements of her hostile work environment claims.

(1993)) (internal quotation marks omitted). Accordingly, the Fifth Circuit has repeatedly held that summary judgment is appropriate when the offensive conduct at issue does not rise to the level of "severe or pervasive harassment."[6]

Courts determine the severity and pervasiveness of potentially offensive behavior by considering the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *See Lauderdale v. Texas Dept. of Crim. Justice, Inst. Div.*, 512 F.3d 157, 163 (5th Cir. 2007) (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).

Notably, however, conduct need not be both severe and pervasive, as the test "is stated in the disjunctive." *Lauderdale*, 512 F.3d at 163; *see also Guadlajara v. Honeywell Int'l, Inc.*, 224 F. Supp. 3d 488, 501-02 (W.D. Tex. 2016) ("Plaintiff need only show that the harassment was severe *or* pervasive, not both.") (emphasis in original). "An egregious, yet isolated, incident can

---

[6] *See, e.g., Gibson v. Potter*, 264 F. App'x 397, 399-401 (5th Cir. 2008) (affirming summary judgment in the employer's favor where, over a four-month period, a supervisor occasionally "engag[ed] in 'sex talk', ask[ed] for dates, and offer[ed] his telephone number" to the plaintiff, and, on one occasion, "grabb[ed] [the plaintiff's] buttocks"); *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 321-22, 328-29 (5th Cir. 2004) (affirming summary judgment in the employer's favor where, sporadically over an eight-month period, a coworker (1) commented to the plaintiff about another employee's body, (2) slapped her on the buttocks with a newspaper, (3) "grabbed or brushed" against the plaintiff's breasts and buttocks, (4) held her cheeks and tried to kiss her, (5) asked the plaintiff to come to the office early so that they could be alone, and (6) stood in the door of the bathroom while she was washing her hands); *Shepherd v. Comptroller of Public Accounts of the State of Tex.*, 168 F.3d 871, 875 (5th Cir. 1999) (affirming summary judgment in the employer's favor where, sporadically over a two-year period, a coworker (1) told the plaintiff that her elbows were the same color as her nipples; (2) told her that she had big thighs while simulating looking under her dress; (3) on several occasions attempted to look down her clothing; (4) often rubbed his hand from her shoulder to her wrist; and (5) twice patted his lap to indicate that she should sit there).

alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Lauderdale*, 512 F.3d at 163 (citing *Harvill v. Westward Commc'ns, LLC,* 433 F.3d 428, 434–35 (5th Cir. 2005)). "The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." *Id*. However, conduct that is neither severe nor pervasive cannot support a sexual harassment claim. *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330-31 (5th Cir. 2009).

Even if an employee has been subjected to severe and/or pervasive harassment, an employer "may avoid Title VII liability when harassment occurred but the defendant took 'prompt remedial action' to protect the claimant." *Williams-Boldware v. Denton Cty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) (quoting *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004)). "Prompt remedial action" is any action "'reasonably calculated' to end the harassment." *Stewart*, 586 F.3d at 329 (quoting *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir. 1999)). "Remedial action" can take many forms, and, "in determining whether the employer's actions were remedial, [the Fifth Circuit has] considered whether the offending behavior in fact ceased." *Williams-Boldware*, 741 F.3d at 641 (quoting *Skidmore*, 188 F.3d at 616). If appropriate, the court may determine at the summary judgment stage—as a matter of law—that an employer took prompt remedial action. *See id.*

Plaintiff asserts that she was subjected to severe and pervasive harassment by Chapman, Paganelli and Guerrero. *See* docket no. 24 ¶¶ 42, 44. Plaintiff further asserts that Hyatt was aware of that harassment and that notwithstanding that awareness, Defendant failed to take steps to adequately respond. *See id.* at ¶ 36.

The Court will address each of Plaintiff's arguments below.

### A. *Chapman*

Defendant first moves to dismiss Plaintiff's claim with respect to Chapman's conduct on the basis that Chapman's alleged actions did not rise to the level of "severe or pervasive" harassment. *See* docket no. 22 pp. 9-10. Thus, according to Defendant, Hyatt was under no obligation—under Title VII—to respond to or remedy Chapman's conduct. *See id.* Second, Defendant asserts that even if the harassment by Chapman was severe or pervasive, Hyatt promptly and adequately responded to Chapman's conduct. *See id.* at pp. 10-13.

### 1. *Severe or Pervasive Harassment by Chapman*

The record contains evidence indicating that Chapman was a frequent guest at the Hotel. *See* docket no. 27-1. Defendant notes that there is no evidence that Chapman actually visited the bar where Plaintiff worked on every occasion he stayed at the Hotel, but the record—including Plaintiff's testimony—demonstrates that Chapman visited the bar on numerous occasions.[7] *See* docket no. 22-1 p. 143. During those visits, the record indicates that Chapman directed sexually explicit and abusive language towards Plaintiff. *See* docket no. 24-1 p. 121; note 2, *supra.* Plaintiff also testified that Chapman repeatedly asked her out and berated her on occasion, but that Chapman never physically touched her. *See id.* at pp. 121, 141.

Frequent incidents of harassment, though not severe, can reach the level of "pervasive," thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. *See Lauderdale*, 512 F.3d at 163. Viewing Plaintiff's allegations in the most favorable light, as we must, Chapman's behavior may have been "pervasive," even if it was not

---

[7] Johnson testified that she had more than five encounters with Chapman at the bar, but could not recall whether or not she had more than ten encounters with Chapman. *See* docket no. 24-1 at pp. 142-43.

necessarily "severe."[8] Johnson alleges that they may have had more than ten encounters, during which he used harassing language, asked her on dates, made sexual advances, and berated her when she declined his advances. Further, according to Plaintiff, Chapman's conduct occurred over a period of nearly two years. Given this pervasiveness, the level of severity necessary to establish an altered work environment is diminished, and Chapman's alleged inappropriate and hostile statements and repeated unwanted sexual advances together may satisfy Title VII's requirement. Thus, at this stage, the Court finds that there is a genuine issue of material fact as to whether Chapman's alleged misconduct towards Johnson created a hostile work environment that is actionable under Title VII.

### 2. Hyatt's Knowledge of and Response to Chapman's Behavior

Because there is a genuine issue of material fact regarding the creation of a hostile work environment due to Chapman's conduct, the Court next must consider whether Hyatt appropriately responded to Chapman's alleged conduct once it was properly notified.

A court may conclude that an employer took prompt remedial action as a matter of law. *Hockman*, 407 F.3d at 329. As a general rule, an employer's obligation to take prompt remedial action is triggered only when the employee follows the reporting procedures in the employer's anti-harassment policy. *See May v. Fedex Freight E., Inc.*, 374 F. App'x 510, 513 (5th Cir. 2010).  .

Here, the record demonstrates that Hyatt's human resources representatives promptly responded to Plaintiff's allegations regarding Chapman once they were made aware of the

---

[8] Although Chapman's alleged conduct is certainly inappropriate and offensive, *see* note 2, *supra*, it is not clear that it satisfies the "severity" requirement of Title VII. *See* note 6, *supra* (describing allegations that have not risen to the level of "severe" under Title VII). However, given that the Court believes that Chapman's conduct may satisfy the "pervasive" requirement, it is not necessary for the Court to determine whether Chapman's conduct may also satisfy Title VII's "severity" requirement.

allegations on November 10, 2016. The record indicates that Hyatt's human resources department quickly raised the issue with upper management, and by December 1, 2016, Chapman had agreed to no longer stay at the Hotel. *See* docket no. 22-10 ¶¶ 7-8. As a result of Defendant's responsive actions, it appears that (i) Chapman did not interact with Plaintiff on any other occasion following Plaintiff's report to human resources, and (ii) Chapman has not returned to the Hotel since November 30, 2016. *Id.*; docket no. 22-1 pp. 148, 164. Therefore, Defendant's actions satisfy the requirements of a "prompt response" for the purposes of avoiding Title VII liability. *See Williams-Boldware*, 741 F.3d at 641.

Nonetheless, Plaintiff argues that such remedial actions were inadequate and delayed, because Plaintiff had notified Hall (her immediate supervisor) of Chapman's harassment months, or potentially even years, prior to Hyatt banning Chapman from the property. *See* docket no. 24 ¶ 45. In support, Plaintiff asserts that she was not required to comply with Hyatt's formal reporting policies because Hyatt also allows employees to report misconduct through more informal channels that were not codified in the anti-harassment policy. *See id.* at ¶ 46. Specifically, Plaintiff points to the testimony of Ruiz (Hyatt's human resources representative), who indicated that an employee "can go to [his or her] manager or the person that [he or she] feel[s] most comfortable with" if he or she has a concern about sexual harassment. *See* docket no. 24-6 p. 17. Plaintiff therefore asserts that she "cannot be expected to divine which method [Hyatt] 'really' intended its employees to use," and that she properly put Hyatt on notice of Chapman's inappropriate conduct when she reported his actions to her supervisor. *See* docket no. 24 ¶ 46.

As an initial matter, the record is not clear as to the exact information regarding Chapman's conduct that was conveyed to Plaintiff's immediate supervisors, who exactly it was

conveyed to, and when exactly it was conveyed.[9] However, even if Plaintiff did convey specific actionable instances of sexual harassment to her immediate supervisor—as the Court will assume for the purposes of resolving the instant Motion—such reporting would not be enough. The Fifth Circuit has made clear that an employer's remedial obligations under Title VII are not automatically triggered by a report to an immediate supervisor, and are instead triggered only once the employee complies with the anti-harassment reporting policy. *Harvill*, 433 F.3d at 438 ("This Court has long recognized that an employee cannot argue her employer failed to take prompt remedial action when she failed to abide by the company's anti-harassment policy."); *Hockman*, 407 F.3d at 329-30 (finding that report of harassment to immediate supervisor was not sufficient to necessitate prompt remedial action when anti-harassment policy directed employees to report harassment to a more senior supervisor); *May*, 374 F. App'x at 512-13 (same).

Further, even if the Court assumes that Plaintiff's communications with Hall were compliant with Hyatt's accepted harassment reporting policies, the law requires Plaintiff to utilize the additional reporting channels provided by Hyatt once she believed that her initial complaints were ineffective. *See Lauderdale*, 512 F.3d at 165 ("In most cases, as here, once an employee knows his initial complaint is ineffective, it is unreasonable for him not to file a second complaint, so long as the employer has provided multiple avenues for such a

---

[9] The record indicates that Hall had knowledge of some interaction Chapman had with a Q Bar staff member November 2015 (approximately a year after Plaintiff alleges the harassment began), but it is not clear that Hall knew any details regarding Chapman's behavior as of that date, and there seemed to be confusion as to who may have additional information. *See* docket no. 24-4. An April 2016 email indicates that Plaintiff told Hall that Chapman had made inappropriate comments to her, but it is still not clear that Hall was aware of most details, and Hall stated that "I never knew this was even close to being this big of a concern." *See* docket no. 24-15. The April 2016 email indicates that Hall asked Plaintiff to write a written statement regarding Chapman's conduct. *See id.* Plaintiff testified that she also spoke with Jackson (another supervisor) about Chapman's conduct, but she could not recall when that conversation occurred. *See* docket no. 29-1 p. 138.

complaint."); *Hockman*, 407 F.3d at 329-30 (affirming summary judgment when plaintiff had complained to her immediate manager that she was being harassed by a co-worker, but failed to escalate the complaint to upper management (per company policy) after she "was dissatisfied with the way" her immediate manager responded); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 413 (5th Cir. 2002) (noting that it was unreasonable for the plaintiff not to pursue alternative reporting channels when the employer's "policy made clear that several persons in addition to the employee's immediate and next higher supervisors were available to receive and pursue sexual harassment claims"). Here, the record clearly indicates that Plaintiff waited nearly two years to utilize Defendant's enumerated anti-harassment reporting policies. Specifically, Plaintiff did not notify Hyatt's human resources department of her complaints about Chapman until the Hotel was conducting its investigation into the Paganelli incident in November 2016, and thus, the record evidence indicates that Plaintiff "unreasonably failed to take advantage of corrective opportunities provided by" Hyatt prior to that date.[10] *See Hockman*, 407 F.3d at 330.

Plaintiff's hostile work environment claim related to Chapman's conduct fails because Plaintiff cannot demonstrate that Hyatt failed to take prompt remedial action following its receipt of notice pursuant to its anti-harassment reporting policies. Instead, the undisputed facts in the record demonstrate that as soon as Plaintiff notified Hyatt of Chapman's inappropriate conduct via Hyatt's enumerated reporting methods, Defendant "took the allegation seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial" measures that

---

[10] Plaintiff asserts that she generally worked at night, and thus, the human resources department and general manager were "not available" to Plaintiff. *See* docket no. 24 ¶ 13. As an initial matter, the record indicates that Plaintiff worked both day shifts and night shifts. *See* docket no. 22-21. In any event, Defendant's anti-harassment policy also provides a telephone hotline and website portal for reporting harassment, and there is no indication that Plaintiff attempted to use those resources nor does Plaintiff's briefing explain why those resources would not have been available.

kept Chapman from interacting with Plaintiff going forward. *See Waymire v. Harris County, Tex.*, 86 F.3d 424, 428 (5th Cir. 1996); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262-63 (5th Cir. 1999) (holding that employer took prompt remedial action when it acted approximately one month after it became aware of the alleged incident). Accordingly, Hyatt is entitled to summary judgment as to Plaintiff's hostile work environment claim premised on its response to Chapman's alleged sexual harassment.

### B. *Paganelli*

In its Motion, Defendant does not argue that Paganelli's conduct—as a result of which he was arrested for sexual assault—cannot constitute "severe" conduct for the purposes of Plaintiff's theory of a hostile work environment. Instead, Defendant moves for summary judgment solely on the basis that Hyatt took prompt remedial action once it was notified of Paganelli's actions. *See* docket no. 22 pp. 7-8.

The record indicates that Hyatt took clear action following the reports of Paganelli's assault of Plaintiff. Shortly after Paganelli assaulted Plaintiff, another guest who witnessed the assault contacted a separate Hyatt employee behind the bar and requested a manager. *See* docket no. 24-10 at p. 24. That employee (De La Vega) left to get the manager on duty. *See id.* Meanwhile, the hotel guest also contacted the front desk to report the assault. *See* docket no. 22-8. Less than ten minutes after the incident had taken place, Hyatt security arrived and, after a few minutes of discussion with Paganelli, Hyatt's security officer (Pineda) directed Paganelli to leave the bar and return to his room. *See* docket no. 22-1 pp. 176-77; docket no. 22-6; docket no. 22-8; docket no. 22-22. Less than twenty minutes after Paganelli left the bar, San Antonio police officers who had been called to the scene were shown the security video footage of the incident. *See* docket nos. 22-7 p. 5; 22-6. After reviewing the film, officers arrested Paganelli in his hotel

room, and he was charged with Assault by Contact. *See* docket no. 22-6; 22-7. Following his return to the Hotel later that morning, Paganelli was evicted by Defendant, and Paganelli was advised that he could not return to the Hotel. *See* docket no. 22-10 ¶¶ 3-4. Later that day, employees from Hyatt's human resources department initiated an investigation into the workplace assault and harassment of Plaintiff. *See* docket no. 22-5 p. 25.

Notwithstanding Hyatt's apparent actions in response to Paganelli's assault of Plaintiff, Johnson argues that Defendant's response was inadequate because (i) De La Vega allegedly failed to follow Hyatt procedures by immediately reporting the assault through the appropriate anti-harassment channels; (ii) De La Vega was not disciplined for his alleged inaction; (iii) Hyatt security personnel did not respond to the bar for several minutes; and (iv) Defendant allowed Paganelli to leave the bar and return to his hotel room unescorted, rather than with an escort, per hotel policy. *See* docket no. 24 ¶¶ 24, 28-30. The Court is not persuaded by Plaintiff's contentions.

As an initial matter, it is not clear from the record that De La Vega failed to respond once he was notified of the assault. Instead, the record indicates that when the witness asked for De La Vega's manager, De La Vega reported that the manager would be there shortly. *See* docket no. 24-10 p. 24. To the extent Plaintiff suggests that De La Vega should have utilized Hyatt's anti-harassment reporting channels in the two minutes following the assault—rather than requesting assistance from his manager—that certainly does not render Hyatt's response inadequate. Moreover, the video indicates that Hyatt security responded less than ten minutes after the reported assault. Although Title VII requires a "prompt" response, it does not require an instantaneous one. *See Skidmore*, 188 F.3d at 616; *Dornhecker v. Malibur Prix. Corp.*, 826 F.2d 307 (5th Cir. 1987) (finding that employer's response 12 hours after the incident was "unusually

prompt" for Title VII purposes and stating that "since the demise of the institution of dueling, society has seldom provided instantaneous redress for dishonorable conduct"). Finally, to the extent that Hyatt security's actions can be faulted for any "delay" in its response or for allowing Paganelli to walk unescorted to his room, the evidence indicates that Plaintiff did not have additional interactions with Paganelli prior to (or following) the arrival of security. *See* docket no. 22-1 p. 199. Indeed, Plaintiff testified that she had no further contact with Paganelli following the assault. *See id.*

The Court recognizes that Plaintiff was assaulted by Paganelli, and the Court does not wish to minimize the nature of his actions. However, the record is clear that Hyatt's reaction more than constituted a "prompt response" to Paganelli's conduct once Hyatt was notified of the assault, and Hyatt's actions were reasonably designed to stop the offending conduct. *See Skidmore*, 188 F.3d at 616 (collecting cases granting judgment as a matter of law where the employer responded promptly and the offending behavior ceased). For that reason, Hyatt is entitled to summary judgment as to Plaintiff's hostile work environment claim premised on its response to Paganelli's assault of Plaintiff.

### C. *Guerrero*

Defendant argues that Plaintiff's claim regarding Guerrero's conduct fails because Guerrero's one-time statement to Plaintiff does not constitute "severe or pervasive" conduct under Title VII. *See* docket no. 22 pp. 13-14. Alternatively, Hyatt argues that even if Guerrero's statement were actionable conduct under Title VII, Defendant took prompt remedial action such that it would not be liable. *Id.* at pp. 14-15.

"Title VII does not reach conduct that is merely offensive—it proscribes only an environment that a reasonable person would find hostile or abusive." *Matherne*, 624 F. App'x at

839 (quoting *Harris*, 510 U.S. at 21) (internal quotation marks omitted). As confirmed repeatedly by the Fifth Circuit, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to [actionable discrimination]." *Id.* (quoting *Faragher*, 524 U.S. at 788).

With respect to Guerrero, Plaintiff's sole allegation of harassment involves his alleged one-time statement that Plaintiff "look[ed] like a fucking hooker." *See* docket no. 22-1 p. 212. Although the statement is certainly inappropriate and offensive, under prevailing Fifth Circuit precedent, this one-time comment is not sufficient to support a harassment claim. Indeed, precedent makes clear that even multiple instances of offensive comments often does not constitute "severe or pervasive" conduct under Title VII. *See Higgins v. Lufkin Industries, Inc.*, 633 F. App'x 229, 230 (5th Cir. 2015) (affirming summary judgment on plaintiff's claim that a coworker had (i) called her a "n[. . .] bitch" and a "whore," (ii) "quoted sexually suggestive hiphop lyrics," and then, (iii) told her that he would issue her a disciplinary infraction unless she "gave him some" because the inappropriate conduct were not "severe or pervasive" within the meaning of Title VII); *see also Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) ("'[T]he mere utterance of an . . . epithet which engenders offensive feelings in an employee[ ]' does not sufficiently affect the conditions of employment to implicate Title VII."). Thus, in light of the threshold that must be surpassed before conduct becomes actionable, the Court concludes—as a matter of law—that Guerrero's one-time statement is insufficient to support Plaintiff's hostile work environment claim.

Accordingly, Hyatt is entitled to summary judgment as to Plaintiff's hostile work environment claim premised on Guerrero's alleged harassment of Plaintiff.[11]

---

[11] Even if the Court assumed that Guerrero's comment constituted actionable sexual harassment, the record appears to indicate that Hyatt took appropriate steps to address the issue. Specifically,

### D. *Conclusion*

As discussed above, the record indicates that there is no genuine issue of material fact with respect to Plaintiff's hostile work environment claims against Defendant based on the incidents involving Chapman, Paganelli and Guerrero,[12] and Defendant is entitled to judgment as a matter of law on those claims. Thus, Defendant's Motion for Summary Judgment is granted as to Plaintiff's hostile work environment claims.

## II.     Retaliation

To prove a *prima facie* case of retaliation, a plaintiff must show (1) she engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there is a causal link between the protected activity and the adverse employment action.

---

Hyatt issued Guerrero a written reprimand warning him that he might be terminated if he repeated the behavior. *See* docket no. 22-15. Hyatt then re-trained the entire Hotel, including the Q Bar and culinary management teams, on identifying and preventing workplace harassment. *See* docket no. 22-17. Moreover, the record indicates that Guerrero has not made any similarly offensive statements to Plaintiff in the period since the incident. *See* docket no. 22-1 p. 212; docket no. 22-13 p. 17. Thus, the Court concludes that Defendant would be entitled to summary judgment on this basis as well, even if Guerrero's harassment were actionable. *See Waymire*, 86 F.3d at 429 (affirming judgment as a matter of law where the employer promptly reprimanded the employee, who never harassed the plaintiff again).

[12] Plaintiff's response seems to assert that the conduct of each alleged harasser (including two separate hotel guests and an employee), should be viewed as one series of events, and thus should be analyzed as "25 months of sexual harassment" and "employer non-action," rather than as individual incidents. *See* docket no. 24 ¶¶ 39, 41. In the above Section, the Court analyzed Hyatt's response with respect to each incident of sexual harassment or assault *once Hyatt had the requisite notice of each specific instance of actionable conduct*. In light of the fact that the alleged conduct by Chapman, Paganelli and Guerrero was *factually unrelated* and would not put Hyatt on notice with respect to the *other alleged incidents* of assault or harassment, the Court does not find it appropriate to treat Chapman's, Paganelli's and Guerrero's conduct as part of a single, lengthy incident of harassment for the purposes of evaluating Hyatt's remedial actions. Further, the incidents involving Paganelli and Guerrero occurred in November 2016 and January 2017, respectively. Thus, the vast majority of any "25 month" period of "employer non-action" consists almost entirely of the "23 months" that Plaintiff alleges that Hyatt failed to respond to Chapman's conduct, *see* docket no. 24 ¶ 14, and the Court has concluded that Defendant took prompt remedial action to stop Chapman's conduct once it received notice via its enumerated reporting methods. *See* Section I.A.2, *supra*.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). The adverse employment action must be "materially adverse," or of such severity that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). If the plaintiff successfully presents a *prima facie* case of retaliation, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the challenged employment action. *Hernandez*, 670 F.3d at 657 (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304–05 (5th Cir. 1996)). If the employer carries its burden, the plaintiff re-assumes the ultimate burden of proving that the employer would not have taken the adverse employment action but for the protected activity. *Id.*

The record indicates that Plaintiff was still employed at the Hotel as of the date of the Complaint and Defendant's Motion. *See* docket no. 22-1 p. 43. Plaintiff's theory of retaliation alleges that Hyatt has "retaliate[d] against Plaintiff by unjustly subjecting her to unjust scrutiny, reduced hours, unfavorable shifts, and refusal to approve reasonable schedule requests solely because Plaintiff complained of the aforementioned sex discrimination." Docket no. 1. At her deposition, Defendant further alleged that Guerrero retaliated against Plaintiff following her complaint regarding his offensive statement by delaying or mispreparing her food orders so that she would receive reduced tip income. *See* docket no. 22-1 pp. 117-18.

Defendant's Motion asserts that Plaintiff's stated theories of retaliation are not cognizable forms of retaliation and/or are not supported by the evidentiary record. *See* docket no. 22 pp. 15-18. In her response, Plaintiff does not directly address Defendant's arguments or the apparent evidentiary weakness regarding those theories of retaliation, and instead asserts that Hyatt's

retaliation came in the form of an "'investigation' that attempted to place the blame on her" following her report of Guerrero's conduct. Docket no. 24 ¶ 50.

The Court will address each of Plaintiff's "retaliation" theories below.

### A. *Johnson's Schedule, Shifts and Hours*

Defendant's Motion asserts that Plaintiff's theory regarding a loss of tip income due to being assigned a disproportionate number of day shifts is not supported by the evidence. *See* docket no. 22 pp. 16-17. Specifically, the record evidence indicates that in the six weeks prior to her formal report of harassment, Plaintiff received 22 night shifts and 6 day shifts. *See* docket no. 22-21. In the six weeks after reporting the harassment by Paganelli and Chapman, Plaintiff received 20 night shifts and 7 day shifts. *See* docket no. 22-21. Moreover, Defendant asserts that there is no clear indication that day shifts actually produce fewer tips than night shifts, and Johnson testified that tips by shift vary "because every group is different." Docket no. 22-1 p. 95.

In light of the record evidence, the Court concludes that Johnson's day shift-night shift theory is not supported by the record. Not only does the apparent record fail to support a *prima facie* case of retaliation related to Plaintiff's schedule, shifts or hours, Plaintiff appears to have abandoned the theory in her response to Defendant's Motion. Moreover, *even if* the evidence clearly indicated that Plaintiff's shift schedule was modified following the incident involving Paganelli, Plaintiff's response identifies no evidence demonstrating—or even supporting an inference—that Johnson's schedule, shifts and/or hours were changed in response to her harassment complaints (or any other alleged protected activity).

Accordingly, Hyatt is entitled to summary judgment on Plaintiff's retaliation claim based on Plaintiff's theory regarding an unfavorable work schedule or reduced shifts.

## B. *Guerrero's Food Order Preparation*

Defendant's Motion also asserts that Plaintiff's theory regarding alleged retaliation by Guerrero (i) is not a viable theory of retaliation as a matter of law, and (ii) is unsupported by the record evidence. *See* docket no. 22 pp. 17-18. Plaintiff's response does not address Defendant's contentions regarding Plaintiff's retaliation theory based on Guerrero's conduct.

As an initial matter, Defendant's Motion questions whether Guerrero even retaliated against Plaintiff, and the record does not clearly demonstrate that such retaliation occurred. *See* docket no. 22 pp. 17-18.[13] In any event, even assuming for argument purposes that Guerrero did intentionally make mistakes with respect to the food orders of Plaintiff's customers, Fifth Circuit precedent makes clear that an employer is not generally liable for the retaliatory conduct of a plaintiff's co-workers absent a showing that the employee's "retaliation" was taken in furtherance of the employer's business. *See, e.g., Hernandez*, 670 F.3d at 657 (affirming summary judgment in the employer's favor where the plaintiff complained of retaliatory harassment by co-workers); *Long*, 88 F.3d at 306 (noting that an employer is not liable for the act of an employee not made in furtherance of the employer's business). Here, the record evidence demonstrates that Guerrero is Plaintiff's co-worker, rather than supervisor, and Plaintiff has provided no evidence demonstrating (or supporting an inference) that any alleged retaliatory conduct by Guerrero was done on behalf of Hyatt. Thus, even if the evidence demonstrated that Guerrero did make mistakes on Plaintiff's food orders in response to Plaintiff's complaint about

---

[13] Defendant's response to Plaintiff's Motion notes that Plaintiff cannot provide evidence demonstrating that Guerrero misprepared the food orders of Plaintiff's customers nor that such mispreparation resulted in fewer tips. *See* docket no. 22 pp. 17-18. In response to Defendant's Motion, Plaintiff does not identify any evidence supporting this theory of retaliation or the required inferences.

his offensive statement—which it does not—Hyatt would not be liable for such conduct, as a matter of law.

Accordingly, Hyatt is entitled to summary judgment on Plaintiff's retaliation claim based on Plaintiff's theory regarding Guerrero's alleged retaliatory "mispreparation" of food orders.

### C. *"Investigation" Into Johnson*

In response to Defendant's Motion, Plaintiff asserts that Hyatt's retaliation with respect to Plaintiff's reporting of sexual harassment came in the form of "an 'investigation' that attempted to place the blame on her." Docket no. 24 pp. 14-15. Defendant responds that such an "investigation" is not supported by the facts, and even if it were, that it would not satisfy the "materially adverse" standard applicable to retaliation claims. *See* docket no. 28 pp. 2-3.

Plaintiff's theory of retaliation appears to be based on Head Chef Young's response after Plaintiff approached Young to report Guerrero's inappropriate and offensive statement. Plaintiff's testimony indicates that during the conversation in which Plaintiff reported Guerrero's offensive statement, Young questioned Plaintiff with an "onslaught" of questions about whether she had done or said anything to provoke the attack. *See* docket no. 24-1 pp. 201-02. Plaintiff felt attacked and victimized by Young's inquiry. *See id.* at pp. 201-03.

However, the record also indicates that Young immediately spoke to Guerrero and Hyatt's human resources department after he learned of Plaintiff's allegations, and following Young's discussion with Guerrero, Guerrero offered to apologize to Plaintiff. *See* docket no. 24-1 pp. 201-03. Moreover, Hyatt disciplined Guerrero in response to the incident, and Young apologized to Plaintiff. *See* docket no. 22-15; docket no. 22-16. Thus, notwithstanding Young's insensitive line of questioning following Plaintiff's report of misconduct, the Court finds it

difficult to agree with Plaintiff's assertion that Young (or Hyatt) initiated an "investigation" that "plac[ed] the blame" on Plaintiff following the incident. *See* docket no. 24 ¶ 50.

Even if Plaintiff's interpretation of the facts is accepted as true—such that Young made offensive statements and informally "plac[ed] the blame" for Guerrero's conduct on Plaintiff during their conversation—the record still does not demonstrate the type of "retaliation" that satisfies the "materially adverse" standard required under Title VII. Importantly, the Supreme Court has made clear that Title VII does not set forth a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80-81 (1998); *see also White*, 548 U.S. at 68 (noting that "lack of good manners" is not actionable as retaliatory conduct as a matter of law). For that reason, the Fifth Circuit has held that rude or insensitive treatment does not constitute "materially adverse" conduct that may support a retaliation claim. *See Aryain*, 534 F.3d at 485 (affirming summary judgment on retaliation claim based on allegation that managers "changed their attitudes towards" plaintiff and treated plaintiff "poorly" following complaint); *Browning v. Sw. Research Inst.*, 288 F. App'x 170, 179 (5th Cir. 2008) (finding no material adverse conduct for purposes of retaliation claim after employer made "humiliating" and "demeaning" statements such as calling employee "crazy"); *see also Escalante v. Holder*, No. EP-09-CV-368-KC, 2011 WL 1528472, at *11 (W.D. Tex. Apr. 20, 2011) (noting that "[u]nwarranted comments and rude behavior do not constitute adverse employment actions" for purposes of retaliation claim). In light of that standard, the evidence and allegations regarding Young's "investigation" of Plaintiff—including his attitude and statements towards Plaintiff—do not satisfy Title VII's "material adverse" standard for retaliation claims.

As a matter of law, Young's conduct—even if fully accepted as alleged and interpreted by Plaintiff—does not rise to the level of "material adversity" that would objectively deter

complaints regarding harassment. *White*, 548 U.S. at 68. The record suggests that Young's "investigatory" questions may have been unprofessional or insensitive, but far more is required before an employer can be held liable for retaliation under Title VII.

Accordingly, Hyatt is entitled to summary judgment on Plaintiff's retaliation claim based on Plaintiff's theory regarding Young's "investigation" and/or his attitude or statements towards Plaintiff.

### D. *Conclusion*

For the reasons set forth above, Defendant is entitled to judgment as a matter of law with respect to each of Plaintiff's theories of "retaliation," as no genuine issue of material fact remains as to those claims. Accordingly, Defendant's Motion for Summary Judgment is granted as to Plaintiff's retaliation claims.

### III. Plaintiff's Other Pending Motions

When filing her response, Plaintiff also filed a Motion to File Under Seal an exhibit that contained information and records regarding a guest's visits to the hotel. *See* docket no. 27. Upon review of Plaintiff's Motion to File Under Seal, the Court finds that Plaintiff's motion has merit and that the specific information in the exhibit (docket no. 27-1) is sensitive and confidential. For that reason, Plaintiff's Motion to File Under Seal will be granted.

Additionally, Plaintiff filed a Motion for Leave to File Sur-Response after Defendant's reply noted that certain evidentiary materials referenced in Plaintiff's response were not attached to Plaintiff's responsive brief. *See* docket no. 29. Defendant opposed Plaintiff's motion for leave because Defendant asserts that (i) Plaintiff did not explain why she failed to attach documents in the first instance, and (ii) Plaintiff attached (and, according to Defendant, "mischaracterized") new evidence that was not referenced in Plaintiff's response. *See* docket no. 30. The Court has discretion as to whether it considers information contained in a sur-reply. *See Warrior Energy*

*Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 751 n.2 (5th Cir. 2014) (per curiam) (unpublished). In this case, after reviewing the information contained with Plaintiff's sur-reply (most of which is evidence that was omitted inadvertently from Plaintiff's response), the Court finds that the Motion for Leave to File Sur-Response should be granted. Accordingly, all such material contained with Plaintiff's sur-reply was considered as part of the record during the Court's analysis of Defendant's Motion for Summary Judgment.

## CONCLUSION AND ORDER

For the reasons set forth above, (i) Plaintiff's Motion to File Under Seal (docket no. 27) is **GRANTED**, and the exhibit attached as docket no. 27-1 will remain **SEALED**; (ii) Plaintiff's Motion for Leave to File Sur-Response (docket no. 29) is **GRANTED**; and (iii) Defendant's Motion for Summary Judgment (docket no. 22) is **GRANTED**.

**IT IS THEREFORE ORDERED** that Defendant is entitled to summary judgment on all of Plaintiff's claims, and Plaintiff shall take nothing as to those claims. The case is closed.

It is so **ORDERED**.

**SIGNED** this ⧸⧹ day of November, 2018.

ORLANDO L. GARCIA
Chief United States District Judge